## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

WANDA KING

                      CIVIL ACTION

VERSUS

                      17-406-SDD-EWD

TRAVIS JAMES HERBERT, *et al*

## RULING

Before the Court is the *Motion for Summary Judgment*[1] filed by Defendants, Louisiana State Police ("LSP") Trooper Burnell Thompson, II ("Trooper Thompson"), LSP Sergeant Douglas Thompson ("Sgt. Douglas Thompson"), LSP Sergeant Daryl Davis ("Sgt. Davis"), and LSP Lieutenant Lanny Bergeron ("Lt. Bergeron") (collectively, "the LSP Defendants" or "Defendants"). Plaintiff Wanda King ("King") filed an *Opposition*,[2] to which Defendants filed a *Reply*.[3] For the reasons that follow, the Court finds that the *Motion* should be GRANTED.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

After dark on July 23, 2016, Plaintiff Wanda King stood in the middle of LA 1 in Iberville Parish, Louisiana, attempting to cross the highway to visit the Jubilee convenience store, where she planned to get a cup of ice.[4] Iberville Parish Sheriff's Deputy Travis Hebert ("Deputy Hebert")[5] struck King with his vehicle. The lower half of King's "right leg was severed upon impact with the police vehicle, and she also suffered

---

[1] Rec. Doc. No. 54.
[2] Rec. Doc. No. 57.
[3] Rec, Doc. No. 60.
[4] Rec. Doc. No. 54-3 (*Deposition of Wanda King*) at p. 15, ll. 9-10; 18-19; 24-25.
[5] Although the caption in this case names Defendant as Travis "Herbert," subsequent pleadings reflect that "Hebert" is the correct spelling. The Court will refer to him as Deputy Hebert.

60154

a right wrist fracture and right ring finger fracture."[6] Acadian Ambulance transported King to Our Lady of the Lake Hospital ("OLOL") in Baton Rouge, where she underwent surgical amputation of her right leg. King's claims against Deputy Hebert (the driver of the vehicle that struck her) and Sheriff Brett Stassi of the Iberville Sheriff's Department are no longer a part of this action, having been previously settled by compromise.[7]

King's remaining claims concern her allegation that, while she was hospitalized, the LSP Defendants "ordered [her] blood to be drawn without her consent and without a warrant."[8] King contends that the warrantless blood draw was a violation of her Fourth Amendment right to be free from unreasonable search and seizure. Defendants urge this Court to dismiss King's §1983 claims on summary judgment, arguing that several exceptions to the warrant requirement applied to their search and that, in the alternative, they are entitled to qualified immunity. The Court will address the parties' arguments in turn.

## II.    LAW AND ANALYSIS

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[9] "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[10] A party moving for summary judgment "must 'demonstrate the absence

---

[6] Rec. Doc. No. 54-2, p. 2, ¶ 6.
[7] Rec. Doc. No. 25.
[8] Rec. Doc. No. 57, p. 1.
[9] Fed. R. Civ. P. 56(a).
[10] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).
60154

of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[11]  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[12]  However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[13]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[14]  All reasonable factual inferences are drawn in favor of the nonmoving party.[15]  However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[16]  "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint."'"[17]

---

[11] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25)).
[12] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[13] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[14] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[15] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[16] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
[17] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249).
60154

B.  Claims Under 42 U.S.C. § 1983

To successfully allege constitutional violations in a § 1983 claim, the Fifth Circuit has held that a plaintiff "must allege specific conduct giving rise to a constitutional violation. This standard requires more than conclusory assertions: The plaintiff must allege specific facts giving rise to the constitutional claims."[18] All of the LSP Defendants are sued in their individual capacities.[19] In order to establish the personal liability of a certain defendant to a plaintiff who is claiming damages for deprivation of his civil rights, the plaintiff must show that particular defendant's action or inaction was a violation of the plaintiff's civil rights.[20] Overall, "[p]ersonal involvement is an essential element of a civil rights cause of action."[21]

The summary judgment evidence in the record demonstrates that the only LSP Defendant to have personal involvement in the events giving rise to King's Fourth Amendment claim was Trooper Thompson. In his *Affidavit*, attached as an exhibit to Defendants' *Motion for Summary Judgment*, Trooper Thompson states that, on July 23, 2016, he "was dispatched to [OLOL] to request a blood sample since a pedestrian had suffered from serious injuries."[22] Trooper Thompson arrived at OLOL before King and "prepped the Blood Kit (BAC #543350) in anticipation of [King's] arrival."[23] When she arrived, Trooper Thompson waited for the nursing staff to complete a medical assessment

---

[18] *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002) (internal citations omitted).

[19] Rec. Doc. No. 22 (*Amended Complaint*), p. 3.

[20] *Archie v. LeBlanc*, No. CV08-CV-1381, 2010 WL 3522296, at *4 (W.D. La. July 28, 2010), report and recommendation adopted, No. 08-CV-1381, 2010 WL 3522293 (W.D. La. Sept. 2, 2010), aff'd, 447 F. App'x 591 (5th Cir. 2011) (citing *Reimer v. Smith*, 663 F.2d 1316, 1322 n. 4 (5th Cir.1981). Also, *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1098 n. 7, 89 L.Ed.2d 271 (1986)).

[21] *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983).

[22] Rec. Doc. No. 54-4, p. 2.

[23] *Id.*

60154

of King in anticipation of her "imminent amputation surgery."[24] During the assessment, Nurse Leigh Ann Trepagnier discovered a pipe containing narcotics residue in King's bra.[25] Trooper Thompson testifies that, "[a]fter the assessment was done, [he] walked back into [King's] room"[26] to request the blood sample. But, Thompson avers that, "due to the severity of her injuries,"

> [King] was unable to sign the Consent form and Blood Collector's Report. I read and explained the Consent Form and Blood Collector's Report prior to the blood draw, as to ensure Plaintiff's understanding. I then witnessed Plaintiff's blood draw and [the nurse] witnessed Plaintiff verbally consent to the blood draw.[27]

Trooper Thompson's personal involvement in the blood draw that King contends was unlawful is also confirmed by King's own *Statement of Disputed Material Facts*.[28] Therein, King states that "it was Trooper Burnell Thompson III who requested Plaintiff's blood draw."[29] Therefore, as an initial matter, the Court finds that the summary judgment evidence demonstrates sufficient personal involvement on the part of Trooper Thompson to support a claim under § 1983. The merits of that claim will be discussed below.

As for the other LSP Defendants – Lt. Bergeron, Sgt. Davis, and Sgt. Douglas Thompson – the record clearly demonstrates that they were not personally involved in the events giving rise to King's Fourth Amendment claim. King does not dispute Defendants' assertion in their *Statement of Undisputed Material Facts* that King "never met Lt. Bergeron or Sgt. Davis."[30] Nor does King dispute Defendants' contention that Lt.

---

[24] *Id.*
[25] Rec. Doc. No. 54-2 at ¶ 26.
[26] *Id.*
[27] *Id.*
[28] Rec. Doc. No. 57-1.
[29] *Id.* at p. 1, ¶ 2.
[30] Rec. Doc. No. 54-2, p. 3, ¶ 18.
60154

Bergeron's involvement on the day of the accident was limited to "bringing the Nikon Total Station, equipment used by investigating officers to take measurements at crash scenes"[31] to the scene of the accident, and that Lt. Bergeron "had no other involvement in the investigation, and had no personal interaction or involvement with Plaintiff, whatsoever."[32] Likewise, King does not dispute Defendants' statements that Sgt. Davis's involvement was limited to "scoping the scene for evidence, such as skid marks and tire marks";[33] "conduct[ing] a breathalyzer test on Defendant Hebert";[34] and performing "a walk-around of Deputy Hebert's vehicle."[35] The undisputed facts are deemed admitted and demonstrate that neither Lt. Bergeron nor Sgt. Davis was personally involved in the blood draw that is the subject of King's remaining claims.

As for Sergeant Douglas Thompson, the summary judgment evidence in the record demonstrates that his personal involvement in this matter was limited to: (1) "arriving on the scene . . . for the purpose of conducting a crash investigation"[36] and (2) visiting King at OLOL the day after her accident. Specifically, Sgt. Thompson attests in his *Affidavit* that he went to OLOL on July 24, 2016, the day after the accident, around 2:30am "to visit and interview Plaintiff."[37] He describes their interaction as follows:

> I saw [King] was awake and speaking with the nurses caring for her. I introduced myself and spoke with her briefly about her injuries and the crash. Based on her statements, I advised her of her rights per Miranda and she told me she understood them. I questioned her about where she was coming from and where she was headed to on the night of the accident . . .Plaintiff said that . . . she purchased the crack-cocaine and smoked it the

---

[31] *Id.* at ¶ 20.
[32] *Id.* at ¶ 21.
[33] *Id.* at ¶ 16.
[34] *Id.* at ¶ 19.
[35] *Id.*
[36] Rec. Doc. No. 54-2, p. 2, ¶ 12.
[37] Rec. Doc. No. 54-6, p. 4, ¶ 19.
60154

same day she was hit by the police car. . .Based on the evidence at the scene of the crash, my observations of the evidence, and statements given by all parties involved, I arrested and released Plaintiff with a misdemeanor summons for Iberville Parish Court for violation of Louisiana revised Statute 32:213, Crossing at Other than Crosswalks, 14:103A(3), Disturbing the peace by appearing in an intoxicated condition, and 40:1023, Prohibited acts (possession of drug paraphernalia).[38]

King disputes certain aspects of Sgt. Thompson's testimony on other grounds but does not bring forth any competent summary judgment evidence that Sgt. Thompson was personally involved in the blood draw itself, which is the event giving rise to her remaining claims. Although it is undisputed that Sgt. Thompson interviewed King about the events preceding her injuries and issued her a misdemeanor summons, there is no evidence that he ordered the blood draw or was present for the blood draw. Apart from his crash reconstruction work at the scene of the accident, which does not establish personal involvement in the alleged Fourth Amendment violation, the evidence reflects that Sgt. Thompson's personal involvement in this matter occurred on July 24, 2016, the day *after* the blood draw that King claims was performed in violation of her constitutional rights. Without evidence of personal involvement, an "essential element" of an individual capacity claim under § 1983, King cannot prevail on her Fourth Amendment claim against Sgt. Thompson, Sgt. Davis, or Lt. Bergeron. Therefore, King's § 1983 claims against them shall be dismissed.

---

[38] Rec. Doc. No. 54-6, pp. 4-5.
60154

C. Fourth Amendment

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The United States Supreme Court has held that this prohibition on unreasonable searches can extend to "the taking of a blood sample,"[39] which "is a search"[40] for Fourth Amendment purposes. Further, the Supreme Court "has determined that warrantless searches and seizures are *per se* unreasonable unless they fall within a few narrowly defined exceptions."[41] Turning to the facts of the instant case, it is undisputed that Trooper Thompson did not obtain a warrant before entering King's hospital room to obtain a blood sample on the night of July 23, 2016. Defendants contend that the lack of a warrant is not dispositive because the circumstances surrounding the blood draw fell within several of the "few narrowly defined exceptions"[42] to the warrant requirement.

### 1. *Exigent Circumstances*

Defendants contend that the "exigent circumstances in this case negated the need for a warrant prior to [King's] blood being drawn."[43] The well-recognized exigent circumstances exception to the warrant requirement "applies when the exigencies of the

---

[39] *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2173 (2016).
[40] *Id.*
[41] *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (citing *Coolidge v. New Hampshire,* 403 U.S. 443 (1971)).
[42] *Id.*
[43] Rec. Doc. No. 54-1, p. 8.
60154

situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment."[44] Courts have recognized a variety of circumstances that "give rise to an exigency sufficient to justify a warrantless search, including law enforcement's need to provide emergency assistance to an occupant of a home, engage in 'hot pursuit' of a fleeing suspect, or enter a burning building to put out a fire and investigate its cause."[45] More relevant to the instant case is the Supreme Court's holding that a warrantless search may be justified where law enforcement reasonably believe that they must act quickly to prevent the imminent destruction of evidence.[46] When considering the exigent circumstances exception in the context of warrantless blood draws, however, the Supreme Court has held that "the natural metabolization of alcohol in the bloodstream" does not present "a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases."[47] Instead, the Court explains, "exigency in this context must be determined case by case based on the totality of the circumstances."[48]

Defendants describe the allegedly exigent circumstances in this case as follows:

Considering the imminent nature of the [amputation] surgery, Plaintiff's blood had to be drawn before she was put under anesthesia and administered several medications. If Plaintiff's blood were drawn after her procedure, the quality of her blood would have significantly changed and would have produced different results; different results would affect the integrity and substance of the LSP investigation.[49]

---

[44] *Kentucky v. King*
[45] *Missouri v. McNeely*, 569 U.S. 141, 149 (2013) (internal citations and quotations omitted).
[46] See *Cupp v. Murphy*, 412 U.S. 291, 296 (1973); *Ker v. California,* 374 U.S. 23, 40–41 (1963).
[47] *Missouri v. McNeely*, 569 U.S. 141, 145 (2013).
[48] *Id.*
[49] Rec. Doc. No. 54-1, p. 11.
60154

King counters that the exigent circumstances exception is inapplicable because, unlike the cases cited by Defendants where warrantless blood draws of drunk drivers were deemed reasonable, King "was not operating a vehicle nor did she injure anyone. She was an innocent pedestrian."[50] The word "innocent" is not helpful to the analysis, but the Court is persuaded to some extent by King's argument that exigent circumstances could not possibly arise where "Defendants never explain the scope or substance of what the investigation was or why a chemical test of Ms. King's blood was necessary to the investigation."[51] In a drunk driving investigation or other situation where the police seek a blood sample from a driver who has caused an accident, exigence is created by the need to secure evidence of the driver's potential intoxication before that evidence dissipates. By contrast here, where it is undisputed that King was not driving, it is less clear why law enforcement urgently needed to obtain a sample of her blood. King was ultimately issued a misdemeanor summons for crossing at other than a crosswalk, disturbing the peace by appearing in an intoxicated condition, and possession of drug paraphernalia. Two of those charges do not depend on the presence or absence of drugs or alcohol in King's system. As for "disturbing the peace by appearing in an intoxicated condition," the LSP Defendants do not explain why the need to issue a summons for that charge was so urgent that it was impracticable to obtain a warrant before ordering a blood draw.

Likewise, the LSP Defendants' heavy reliance on the recently decided *Mitchell v. Wisconsin*[52] case is not persuasive. *Mitchell* stands for the proposition that:

> When police have probable cause to believe a person has committed a
> drunk-driving offense and the driver's unconsciousness or stupor requires

---

[50] Rec. Doc. No. 57, p. 2.

[51] *Id.*

[52] *Mitchell v. Wisconsin*, 139 S. Ct. 2525 (2019).

60154

> him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment.[53]

Here, however, King was not driving, nor was she unconscious. The Supreme Court based its holding on the exigent circumstances exception to the warrant requirement, and the LSP Defendants apparently expect this Court to find that holding to be controlling here, despite the obvious factual distinctions between an unconscious motorist suspected of drunk driving and a pedestrian injured by a driver. Although the *Mitchell* opinion does emphasize the importance of ensuring "highway safety," the Court's highway safety discussion is clearly focused on "the effects of irresponsible *driving*."[54] There is no indication in *Mitchell* that the Supreme Court views irresponsible pedestrian behavior as a similarly compelling issue that justifies warrantless searches.

Defendants also argue that, because Deputy Hebert, the driver of the vehicle that struck King, submitted to a breathalyzer test, "it was customary for Plaintiff's to be tested, as well."[55] This argument is unsupported by the law. Even if this tit-for-tat rule *were* the law with respect to testing, it would not explain Defendants' actions here, since King was subject to a blood draw, not a breath test. The Supreme Court has stated that "breath tests are less intrusive"[56] than blood tests from a Fourth Amendment standpoint.

The Supreme Court instructs that "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."[57] That

---

[53] *Id.* at 2539.
[54] *Id.* at 2535 (emphasis added).
[55] Rec. Doc. No. 54-11, p. 15.
[56] *Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2533, 204 L. Ed. 2d 1040 (2019).
[57] *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984).

60154

burden must be met by "'demonstrat[ing] specific and articulable facts to justify the finding of exigent circumstances.'"[58] The LSP Defendants have failed to demonstrate as a matter of law that the exigent circumstances exception applies because they have failed to articulate specific facts demonstrating that their need to obtain evidence in support of a misdemeanor charge against the injured party in a car accident presented exigent circumstances as described by the Supreme Court, namely, circumstances where "there is compelling need for official action and no time to secure a warrant."[59] The Court finds that the exigent circumstances doctrine does not provide an exception to the warrant requirement in this case and does not support summary dismissal.

### 2. Consent

Next, the LSP Defendants contend that King's Fourth Amendment rights were not violated because she consented to the blood draw.[60] King disagrees, nothing that she "was explicit in her deposition that she never consented to the blood draw at issue."[61] Based on the evidence in the record, the Court finds that disputed issues of material fact stand in the way of summary judgment on the consent issue.

"[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."[62] In order to satisfy the consent exception, "the government must demonstrate that there was (1) effective consent, (2) given voluntarily, (3) by a party with actual or apparent authority."[63]

---

[58] *United States v. Shephard,* 21 F.3d 933, 938 (9th Cir.1994) (quoting *United States v. Driver,* 776 F.2d 807, 810 (9th Cir.1985)).
[59] *McNeely,* 569 U.S. at 149 (2013) (quoting *Tyler,* 436 U.S. at 509, 98 S.Ct. 1942).
[60] Rec. Doc. No. 54-1, p. 11.
[61] Rec. Doc. No. 57, p. 2.
[62] *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973).
[63] *United States v. Danhach,* 815 F.3d 228, 234 (5th Cir. 2016).
60154

In this case, the only evidence probative of King's consent or lack or consent comes in the form of statements from the two parties who were present for the blood draw – King and Trooper Thompson. At her deposition, King was asked, "Did you ever verbally consent to the blood draw?" to which she answered, "No."[64] Asked if there was "anybody else in the room that may have consented on [her] behalf," King answered, "No."[65] When presented with a signed Consent Form for the blood draw, King stated, "that is not my signature . . . that is not my writing."[66] Defense counsel pointed out that, next to the signature, the words "unable to sign" were written, and he suggested that there was "probably someone in there that knew that you weren't able to write, and so they had to do it."[67] King replied, "No. It wasn't nobody in there. Nobody did never come to me with no – none of this asking me for – to draw no blood."[68] Clearly, King is adamant that she did not consent, verbally or otherwise, to the blood draw.

Trooper Thompson's affidavit testimony tells a different story. As discussed above, he attests that:

> Due to the severity of her injuries, [King] was unable to sign the Consent form and Blood Collector's Report. I read and explained the Consent Form and Blood Collector's Report prior to the blood draw, as to ensure Plaintiff's understanding. I then witnessed Plaintiff's blood draw and [the nurse] witnessed Plaintiff verbally consent to the blood draw.[69]

Notably absent from Trooper Thompson's attestation is any statement that King consented. As referenced at King's deposition, Defendants attach a signed Consent

---

[64] Rec. Doc. No. 49-6, p. 40, ll. 17-19.
[65] *Id.* at p. 43, ll. 22-24.
[66] Rec. Doc. No. 49-6, p. 43, ll. 1-2.
[67] *Id.* at p. 44, ll. 8-10.
[68] *Id.* at p. 44, ll. 11-13.
[69] *Id.*
60154

Form, which states, "I have granted permission for blood samples to be taken."[70] Wanda L. King is listed as "Name of Subject," but on the Signature of Subject line, the words "unable to sign" are handwritten. Defendants do not explain who filled out the form on King's behalf; they simply state that King was "unable to sign" and that "[n]onetheless, Plaintiff still verbally consented to the draw."[71] The implication appears to be that Nurse Leigh Ann Trepagnier signed the form on King's behalf, but Trepagnier's signature on the Blood Collector's Report appears under the statement, "I hereby certify that I drew blood specimens from the above named person."[72] This may be evidence that Trepagnier performed the blood draw, but it does evince King's consent or lack thereof. As such, there is a genuine issue of material fact with respect to whether or not King consented to the draw.

Defendants also argue that Louisiana law negates the issue of King's consent because it provides that individuals may be "*deemed* to have given consent"[73] to blood tests under certain circumstances. However, Defendants' contention that Louisiana law "seemingly equat[es] intoxicated drivers with intoxicated pedestrians"[74] is belied by the text of the relevant statute. Louisiana Revised Statute § 32:666 provides that:

> When a law enforcement officer has probable cause to believe that a person has violated . . . [a] law or ordinance that prohibits operating a vehicle while intoxicated, that person may not refuse to submit to a chemical test or tests . . . in any case wherein a fatality has occurred or a person has sustained serious bodily injury in a crash involving a motor vehicle.[75]

---

[70] Rec. Doc. No. 49-12, p. 2.
[71] Rec. Doc. No. 54-1, p. 12.
[72] Rec. Doc. No. 54-9, p. 2.
[73] La. R. S. § 32:661 (emphasis added).
[74] Rec. Doc. No. 54-1, p. 15.
[75] La R. S. 32:666.

60154

Clearly, on its face, this statue pertains to individuals suspecting of "*operating a vehicle* while intoxicated." The parties agree that King was a pedestrian, not a driver. Defendants attempt to shoehorn this statue into applicability by bolding and italicizing the provisions that refer to "serious bodily injury" (which did occur in this case); but that does not change the fact that the statute obviously addresses the issue of consent by impaired drivers and thus fails to support Defendants' contention that King's consent was supplied by the law. The record does not support summary dismissal of King's Fourth Amendment claim on the grounds of consent.

### 3.  Inevitable Discovery

The LSP Defendants argue that the blood draw did not violate King's Fourth Amendment rights because "it was inevitable that her blood would be collected by OLOL medical staff."[76] Inevitable discovery is an exception to the exclusionary rule which "allows for the admission of evidence that would have been discovered even without the unconstitutional source."[77] Under the inevitable discovery doctrine, "there must have been a reasonable probability that the evidence would have been discovered from an untainted source."[78] Additionally, under Fifth Circuit precedent, the Government must show that it "was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation."[79] Indeed, "[f]or the inevitable discovery exception to apply, 'the alternate means of obtaining the evidence must at least be in existence and, at least to some degree, imminent, if yet unrealized.'"[80] The Government has the burden of proving

---

[76] Rec. Doc. No. 54-1, p. 16.
[77] *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).
[78] *Id.*
[79] *United States v. Zavala,* 541 F.3d 562, 579 (5th Cir. 2008).
[80] *Id.* at 580 (quoting *United States v. Cherry,* 759 F.2d 1196, 1205 n. 10 (5th Cir.1985)).
60154

"by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . ."[81]

In this case, the LSP Defendants have not met that burden. Their conclusory assertion that King's "blood would still have been inevitably available through OLOL"[82] is not competent summary judgment evidence that LSP would have inevitably gained access to the sample. The LSP Defendants do not explain how they would have obtained it except "through OLOL," and they do not demonstrate, as required by Fifth Circuit doctrine, that they were "actively pursuing" the possibility of obtaining King's blood work from OLOL. They merely state that they *could have* gotten it after the fact from the hospital.[83] The Court fails to see how OLOL performing a blood draw on King in advance of her emergency surgery *inevitably* suggests that LSP would have been privy to that draw or to the results of any screening performed. The OLOL Consent for Treatment form that the LSP Defendants cite as evidence of King's consent to the hospital's blood draw states that the undersigned patient authorizes and consents to the "preservation, examination, testing, retention, use, including, without limitation, the use for scientific, diagnostic . . . purposes, *by Hospital*, at its discretion. . ."[84]

Likewise, the "Adult Trauma Emergency Orders" document that Defendants cite states that "clinical condition is sufficiently urgent to require the emergency release of blood products."[85] In fact, the statement in its entirety reads: "Transfuse emergency

---

[81] *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

[82] Rec. Doc. No. 54-1, p. 17.

[83] Rec. Doc. No. 60, p. 4 ("that sample could have been obtained by Louisiana State Police in furtherance of their investigation").

[84] Rec. Doc. No. 54-12.

[85] Rec. Doc. No. 1-4, p. 2.

60154

release un-crossmatched blood – Clinical condition is sufficiently urgent to require the emergency release of blood products prior to completion of routine blood bank testing."[86] If the "emergency release" contemplated by this form involves law enforcement, Defendants fail to demonstrate how. Overall, nothing in the evidence brought forth by Defendants establishes that the inevitable discovery doctrine applies to this situation. Therefore, the LSP Defendants' *Motion for Summary Judgment* is denied with respect to their argument that King's blood draw comported with the Constitution because the sample would have inevitably ended up in the hands of LSP.

### 4. Qualified Immunity

The LSP Defendants further contend that the claims against them should be dismissed because they are entitled to qualified immunity. In accordance with this Court's ruling, *supra*, the only Defendant as to whom King has pled sufficient personal involvement in her Fourth Amendment claim is Trooper Thompson. Accordingly, the Court will undertake the qualified immunity analysis only with respect to Trooper Thompson. King contends that Thompson's conduct is not shielded by immunity because it was not "reasonable or customary to order a blood draw from an injured pedestrian."[87] Defendants disagree, explaining that Thompson was "merely doing [his] job[] and . . . attempting to conduct a thorough and complete investigation."[88]

In *Saucier v. Katz*, the Supreme Court set forth a two-part framework for analyzing whether a defendant was entitled to qualified immunity.[89] Part one asks the following

---

[86] *Id.*
[87] Rec. Doc. No. 57, p. 4.
[88] Rec. Doc. No. 54-1, p. 19.
[89] *Saucier v. Katz*, 533 U.S. 194 (2001).
60154

question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"[90] Part two asks whether the allegedly violated right is "clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[92] A court need not address these two questions sequentially; it can proceed with either inquiry first.[91] "If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were 'objectively reasonable' in light of 'law which was clearly established at the time of the disputed action.'"[92] Officials "who reasonably but mistakenly commit a constitutional violation are entitled to immunity."[93]

There is no question that, under the Fourth Amendment, King enjoyed a clearly established constitutional right to be free from unreasonable warrantless searches. Nor can there be any dispute that the blood draw performed on her was such a search.[94] Assuming, for purposes of the qualified immunity analysis, that Trooper Thompson's conduct violated King's rights, the question becomes: were Trooper Thompson's actions objectively reasonable? Based on the record, the following facts are undisputed: Trooper Thompson "was dispatched to [OLOL] to request a blood sample since a pedestrian had suffered from serious injuries."[95] Once he arrived at OLOL, Trooper Thompson "prepped

---

[90] *Id.* at 201.
[91] *See Pearson*, 555 U.S. at 236 ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."); *see also Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 469 (5th Cir. 2014).
[92] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citing *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999)).
[93] *Williams*, 180 F.3d at 703.
[94] *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2173 (2016).
[95] Rec. Doc. No. 54-4, p. 1.
60154

the blood kit (BAC 543350) in anticipation of [King's] arrival."[96] Before King's amputation surgery, Nurse Leigh Ann Trepagnier performed a blood draw.[97] A toxicology report was ordered by LSP and ultimately indicated the presence of "cocaine/metabolites/benzolecgonine" in King's system.[98]

This Court held, *supra*, that there is a genuine dispute of material fact surrounding whether or not King actually consented to the blood draw. King suggests that this disputed fact issue prevents the Court from coming to a conclusion on qualified immunity. The Court disagrees. Even assuming that the blood draw was performed without King's consent and in the absence of a true exigency or other circumstances that give rise to an exception to the warrant requirement – in other words, in violation of the Fourth Amendment – King has not shown that Trooper Thompson's actions were objectively unreasonable. Trooper Thompson was dispatched to obtain a blood sample in furtherance of a crash investigation. The fact that the LSP Defendants do not articulate the scope or purpose of their investigation in terms that are satisfactory to the Plaintiff is not dispositive of the issue. If Thompson mistakenly believed that, due to exigency or inevitable discovery, he had a legal basis to perform the blood draw without a warrant, that mistake remains within the realm of conduct shielded by qualified immunity. Indeed, "[a]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and thus do not divest the official of qualified immunity."[99]

---

[96] Rec. Doc. No. 54-2, p. 4.
[97] Rec. Doc. No. 54-2, ¶ 24 and 30.
[98] Rec. Doc. No. 54-4, p. 3.
[99] *Whitley v. Hanna*, 726 F.3d 631, 643 (5th Cir. 2013).
60154

King has identified no evidence that Trooper Thompson's request for a blood draw was deliberately indifferent or that "every reasonable official [in Thompson's position] would have understood that what he is doing violates"[100] Plaintiff's rights. The Supreme Court in *Mitchell* held that a warrantless blood test is sometimes appropriate for a driver suspected of intoxication due to the exigency involved. If Trooper Thompson inferred that the same principle applied to a pedestrian suspected of intoxication after a vehicle accident, that inference, while arguably mistaken, was not undertaken in deliberate indifference to King's rights. King complains that the LSP Defendants "cite no case supporting, or otherwise justify [sic], the warrantless drawing of blood from a pedestrian simply because the pedestrian was injured by someone else."[101] She is right; they cite no such case. However, the lack of case law on this issue actually bolsters Trooper Thompson's argument for qualified immunity. In the absence of cases holding that a warrantless blood draw on a pedestrian involved in a pedestrian-vehicle accident is *per se* unreasonable, it would be unreasonable to expect that any officer in Trooper Thompson's position would have known that what he was doing was unconstitutional. Thus, Trooper Thompson is entitled to qualified immunity and the claims against him shall be dismissed with prejudice.

---

[100] *Reichle v. Howards,* 556 U.S. 658, 664 (2012).
[101] Rec. Doc. No. 57, p. 4.
60154

## III.   CONCLUSION

For the reasons stated above, Defendants' *Motion for Summary Judgment*[102] is hereby GRANTED and the claims against them are dismissed with prejudice.

**IT IS SO ORDERED**.

Signed in Baton Rouge, Louisiana on <u>May 12, 2020</u>.


_____

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[102] Rec. Doc. No. 54.

60154